WILLIAM A. HUFFMAN and BETTY J. HUFFMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Huffman v. Commissioner
Docket No. 3639-73.
United States Tax Court
T.C. Memo 1974-108; 1974 Tax Ct. Memo LEXIS 213; 33 T.C.M. (CCH) 543; T.C.M. (RIA) 74108; April 30, 1974, Filed. *213 William A. Huffman, pro se. Ray Collins, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Scott, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1971 in the amount of $2,004.30. The only issue for decision is whether respondent properly increased the income as reported by William A. Huffman by $5,450 which was paid to him by his employer in connection with the sale of his home in Detroit, Michigan when he was transferred by his employer to Dallas, Texas. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William A. and Betty J. Huffman, husband and wife, were legal residents of Dallas, Texas at the time of the filing of their petition in this case. They filed their joint Federal income tax return for the calendar year 1971 with the Director of Internal Revenue Service Center, Austin, Texas. William A. Huffman (hereinafter referred to as petitioner) is an employee of the Ford Motor Company. In September 1971 petitioner was transferred from Detroit, Michigan to Dallas, Texas for the convenience of his employer and at the request of his employer. Prior to September *214 1971 petitioner and his family resided in a home which they owned in Orchard Lake, Michigan. At the time of his transfer to Dallas, Texas petitioner had a total of $59,024.60 invested in his home in Orchard Lake. Under the rules of the Ford Motor Company with respect to employees who are transferred for the convenience of the company, petitioner was granted living expenses for his relocation to Dallas, Texas for a period not to exceed 60 days, and he was allowed within that 60-day period 30 days of living expenses for his wife and family.Under very unusual circumstances a request for an extension of living expense days may be granted, but reluctance to relocate children during the school year or inability to take occupancy of a residence either in an existing home or one under construction are not considered valid reasons by Ford Motor Company for an extension of the living expense period.
Because of his knowledge of the rules of the Ford Motor Company, petitioner was anxious to sell his home in Detroit and buy a home in Dallas as expeditiously as feasible. At the time of petitioner's transfer from Detroit to Dallas, the Ford Motor Company had the following regulations with respect *215 to house sale assistance for employees transferred at the direction of the company. GUARANTEED OFFER The Company will request TI Home Transfer Service Corporation (TI) to make you a purchase offer as soon as practicable after your transfer. You will be contacted by TI's Property Coordinator who is experienced in all phases of real estate. The Property Coordinator will describe TI's program and make arrangements for two fair market value appraisals of your house. One appraiser is selected by you from a list provided by the TI Property Coordinator, and the other appraiser is selected by TI. The average of these appraisals is the price offered to you for your house. In the event the lower appraisal varies more than 7.5% from the higher one, a third appraisal is authorized by TI. The offer price is then based on the average of the three appraisals. * * * 10% PAYMENT PLAN If you wish to sell your house on the open market, you may do so and the Company will pay you 10% of the sales price to help cover selling expenses. * * * The objective of Ford Motor Company's relocation policy is to relocate the employee as quickly and easily as possible with the minimum of inconvenience *216 so that he can concentrate on his new assignment. At the time of petitioner's transfer he knew of homes in his area that were selling for prices ranging from $57,500 to $64,900. When petitioner put his house on the market, he set the price of the house at $59,900. The first offer he received for his house was for $54,500. Knowing that he would be paid 10 percent of that amount by Ford Motor Company and being anxious to move his family to Dallas, Texas as soon as possible, he accepted this offer. Petitioner had to pay a $3,270 sales commission on the sale of his house. Petitioner was paid in 1971 $5,450 by Ford Motor Company, representing 10 percent of the sales price of his house. Upon moving to Dallas, Texas petitioner purchased a house for which he paid $80,000. Petitioner, prior to his transfer in 1971 had been transferred by Ford Motor Company from Richmond, Virginia to another area. He had had his house appraised under the Guaranteed Offer House Sale Assistance Plan of Ford Motor Company, and the appraisers had appraised it approximately $8,000 below what other realtors in the area appraised it and sold it for. Because of that experience petitioner did not have an *217 appraisal made or discuss with the company taking the guaranteed offer on the sale of his house in Detroit when he was transferred to Dallas. In addition to paying certain living costs for petitioner and his family, Ford Motor Company paid certain of petitioner's moving expenses directly to the movers. Petitioner on his Federal income tax return for the calendar year 1971 computed the sales price received for his residence in Detroit, Michigan to be $59,950 consisting of the $54,500 received from the purchaser and the $5,450 received from Ford Motor Company. From this amount petitioner subtracted what he showed to be his basis in his home, showing a resultant net profit of $709.50 which he used to reduce the $80,000 cost of his new residence and did not report as income. [1]
Petitioner on his income tax return reported wages of $44,791.40 which he computed on the attached schedule as follows: Wages
$50,241.40
Employee's residence purchased amount accounted for to employer's reimbursement and included in W-2
5,450.00
$44,791.40
*218 Petitioner also claimed an adjustment in computing his adjusted gross income for moving expenses in the amount of $6,632.14, computed as follows: 1. Transportation expenses to move household and personal property
$4,022.90
2. Travel, meals, and lodging expenses to move from old residence to new area of principal employment
109.24
3. Pre-move travel, meals, and lodging expenses to search for a new residence
$1,213.61
4. Temporary living expenses in new location (or area) prior to moving into permanent quarters
918.85
5. Total (Add lines 3 and 4)
$2,132.46
6. Expenses incident to: (a) sale or exchange of taxpayer's former residence
3,270.00
8. Total
$3,270.00
9. Add lines 5 and 8
5,402.46
10. (a) Enter lesser of (i) the amount on line 5 (or the portion of it you choose to include in the "limitation"); or (ii) $1,000 ($500 if married, filing a separate return)
1,000.00
10 (b) Enter lesser of (i) the amount on line 8 (or the portion of it you choose to include in the "limitation"); or (ii) $2,500 ($1,250 if married, filing a separate return) less the amount claimed on line 10(a)
$1,500.00
11. Total moving expenses (Add lines 1, 2, 10(a) and 10(b)
$6,632.14
12. Reimbursements and allowances received for this move (other than amounts included on Form W-2
-0-
13. If line 12 is less than line 11, enter the excess expenses here and on line 42, Form 1040
$6,632.14
*219 Respondent in his notice of deficiency increased petitioner's income as reported by $5,450 merely explaining that he failed to report this amount of his gross income received from his employer. OPINION Petitioner's position is that since he took the first offer on his house, knowing that he would be paid 10 percent of that amount by Ford Motor Company, in effect the $5,450 he received from Ford Motor Company was a part of the sales price of his house and therefore he correctly excluded it from his gross income. Respondent takes the position that the cases of , aff'd. (C.A. 4, 1963); ; ; and (Ct. Cls., 1968), certiorari denied , supports his position that the $5,450 received by petitioner constitutes taxable income to petitioner. In , we held an amount of $5,000 paid by a new employer to an employee because of having guaranteed that employee a minimum sales price of his home *220 at the place of his previous residence to be incentive compensation. In so holding we specifically declined to follow our previous holding in . The taxpayer in the Bradley case was a new employee of the company which made the $5,000 payment to him. After the taxpayer assumed his duties at his new place of employment, his family remained in Wilmington, attempting to sell the family home at a price for which it had been appraised by a realtor. After the taxpayer had been in Richmond for approximately 2 months and the home had not been sold, in order that the taxpayer might give his full attention to his new employer's work, that employer agreed to guarantee the price of the taxpayer's home. When the taxpayer sold his home for $5,000 less than the guaranteed price, his new employer paid the $5,000 difference to the taxpayer. In the Ferebee case we held a payment by a new employer of the taxpayer's sales commission on his home at his previous place of employment to be taxable as compensation. The case of , involved an amount received by the taxpayer from his employer as reimbursement of *221 selling expenses on a residence he sold in Detroit, Michigan when he was transferred by that employer to Minneapolis, Minnesota for the convenience of his employer. In the Pederson case, we relied on our holdings in the Bradley and Ferebee cases in refusing to accept the taxpayer's contention that because of the payment having been made by a new employer, those cases were distinguishable. In the Pederson case we pointed out that the Schairer case which we refused to follow in the Bradley and Ferebee cases had involved a present employer directing an employee to move to a house close to his employment and reimbursing him for a loss on the sale of his old residence. We stated in the Bradley case that we did not consider the Schairer case to be distinguishable on its facts but would no longer follow the Schairer case. , involved a taxpayer who received a reimbursement for a loss on the sale of his home. In concluding that the amount was includable in the taxpayer's income, the Court of Claims referred to the Schairer case as laying down the "now-abandoned rule that reimbursement for loss on the sale of a residence incurred as a result of *222 a transfer to a new location is merely a return of capital." That Court stated in this respect (): In , the court limited the Schairer rule, holding that a payment received by an employee toward the purchase price of a new home at the new location was taxable as compensation in that it was an evidence of the employer's desire to assure the continued services of the employee. In , a new employee was taxed at ordinary income rates on a reimbursement for loss on the sale of his home because the court found that the payment was bargained for as a condition of accepting the new employment in a different city. Finally, , affirming , held taxable as incentive compensation a payment by an employer reimbursing a new employee for the difference between the appraised value and the sales price of the old residence. The Tax Court, three judges dissenting, specifically declined to follow Schairer. The Court of Appeals affirmed, holding as "illusory" *223 Schairer's reasoning that the payment was not compensation because it was intended only as a guarantee against loss of capital. * * * Recently the Tax Court has reaffirmed its position in , and , in a case bearing a similarity to the instant proceedings. . Taxpayer, an employee of long standing with his company, was transferred for the convenience of his employer and at his employer's request from Detroit, Michigan to Minneapolis, Minnesota. Several months after his transfer, taxpayer sold his Detroit residence at a loss notwithstanding a reimbursement by the employer of the selling expenses. [Footnote omitted.] He attempted to distinguish cases in which a new employee was reimbursed for the loss from the sale of a house or of selling commissions from his own situation as an "old" employee with his company for 20 years. The Court reviewed the history of these reimbursements and considered Pederson not to be distinguishable from Bradley and Ferebee and declared the reimbursement for selling expenses to be income. * * * The Court of Claims specifically rejected *224 the taxpayer's contention that the payment he received was a return of capital, pointing out that a loss on the sale of a home regardless of the reason the home was sold is essentially personal and that reimbursement to a taxpayer of a personal loss results in taxable income to the taxpayer. The Court of Claims finally discussed and rejected an argument that since the taxpayer in the Ritter case could have opted to take a guaranteed payment from his employer instead of a reimbursement for a loss on the sale of his residence, the loss reimbursement should be considered as part of the sales price of the house. Petitioner in the instant case does not argue that the fact that he might have elected to accept the sale assistance plan by selling his home to a realtor provided by Ford Motor Company causes the reimbursement to be properly part of the selling price of his house. Petitioner, himself, realized and testified that had he opted to take the sales assistance plan provided by Ford Motor Company be selling his house to a realtor, he did not know what he would have gotten for the house and in his judgment he might have gotten less than he otherwise got. We conclude that respondent *225 properly increased petitioner's income by the $5,450. Decision will be entered for respondent. Footnotes
1. The basis shown by petitioner in his home on his return was stipulated by the parties to be understated with the result that there would be no gain on petitioner's home even if he correctly reported $59,950 as its sales price. ↩